UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the Commonwealth of MASSACHUSETTS, VIRGINIA, the DISTRICT OF COLUMBIA, and the policyholders of XYZ Nos. 1-10 Insurance Companies, §§§§§§§§§§§§§§ | Civil Action No. _____ |
| *ex rel.* [UNDER SEAL], §§ | **COMPLAINT** |
| PLAINTIFFS, §§§ | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. §§ | **DEMAND FOR JURY TRIAL** |
| [UNDER SEAL], §§ | |
| DEFENDANT. § | |

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the Commonwealth of MASSACHUSETTS, VIRGINIA, the DISTRICT OF COLUMBIA, and the policyholders of XYZ Nos. 1-10 Insurance Companies, §§§§§§§§§§§§§§ | Civil Action No. _____ **COMPLAINT** **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** **DEMAND FOR JURY TRIAL** |
| *ex rel.* PATRICIA FRATTASIO, §§ | |
| Plaintiffs, §§ | |
| v. §§ | |
| [UNDER SEAL], §§ | |
| DEFENDANT. § | |

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

2

The United States of America (the "United States") and the Plaintiff States (defined below) (the United States and the Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relator, Patricia Frattasio ("Relator"), bring this action under the Federal False Claims Act (the "False Claims Act" or "FCA"), 31 U.S.C. § 3729 *et seq*., and the false claims acts and analogous statutes of the respective Plaintiff States[1] against Pharmaceuticals, Inc. and its holding company, Biohaven Pharmaceuticals Holding Company, Ltd. ("Biohaven" or "Defendant" or "Company") to recover all damages, penalties, and other remedies provided by the aforementioned statutes, and for their complaint ("Complaint") allege:

1.     Based on the Relator's personal knowledge and further investigation, sufficient evidence exists to allege that Defendant has violated and continues to violate the False Claims Act,

---

[1] Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq*.; California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871 *et seq*.; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq*.; Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq*.; Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq*.; Florida False Claims Act, Fla. Stat. § 68.081 *et seq*.; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq*.; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.; Illinois False Claims Act, 740 ILCS 175/1 *et seq*.; Illinois Claims Fraud Prevention Act, 740 I.L.C.S §§ 92/1 *et seq*.; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq*.; Iowa False Claims Law, I.C.A. § 685.1 *et seq*.; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*.; Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq*.; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq*.; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq*.; Montana False Claims Act, MCA § 17-8-401 *et seq*.; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*.; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq*.; New Jersey Medical Assistance & Health Services Act, N.J.S.A. 30:4D-1 *et seq*.; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq*.; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq*.; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq*.; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq*.; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq*.; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq*.; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*.; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq*.; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq*.; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq*.

31 U.S.C. § 3729, state false claims acts, and applicable regulatory and ethical guidance by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the government) as a result of off-label marketing and other prohibited marketing strategies.

## INTRODUCTION

2.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the states named herein (the "Government") arising from false and fraudulent records, statements and claims made, used and caused to be made, used, and presented by Defendant and/or their agents, employees, predecessors, affiliates and co-conspirators, in violation of the False Claims Act, myriad state False Claims Act analogues, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, by causing others to submit fraudulent bills to the Government by knowingly providing remuneration in the form of improper speaker program honoraria; ad hoc kickbacks; electronic health record software cost assistance; and copay cards.  These *quid quo pro* arrangements violate the Anti-Kickback Statute because they involve the provision of financial benefits in return for referrals of business, which result in reimbursement from federal and state health care programs.  As a result of this *quid quo pro* arrangement, claims for Defendant's drug, Nurtec, which were tainted by unlawful kickbacks, have been, and continue to be, submitted to and paid by federal and state health care programs in violation of the FCA.  Biohaven also knowingly misrepresents Nurtec's efficacy to the same end.

## PARTIES

3.      Relator served as the Neuroscience Sales Specialist ("NSS") for Biohaven in the Rochester, NY sales territory from November 2019 – February 2021.  Prior to joining Biohaven,

Relator worked in project management and pharmaceutical sales for companies including Valeant, Inc. and Johnson & Johnson. She holds a B.A. in business and accounting.

4.      Biohaven Pharmaceuticals, Inc. is a fully owned subsidiary of British Virgin Island-based Biohaven Pharmaceuticals Holding Company, Ltd., (collectively, "Biohaven," "Defendant" or "Company") and trades on the New York Stock Exchange under the ticker BHVN with a market cap of $8.2B. Biohaven purports to be "a clinical-stage biopharmaceutical company with a portfolio of innovative, late-stage product candidates targeting central nervous system diseases, including neurological and rare disorders." The Company's executive offices are located at 215 Church Street, New Haven, CT.

## JURISDICTION AND VENUE

5.      Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

6.      The Court may exercise personal jurisdiction over Defendant, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq*., and complained of herein took place in part in this District and the Defendant transacted business in this District as described herein.

7.      In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed in camera and will remain under seal for a period of at least 60 days and shall not be served on the Defendant until the Court so orders.

8.      Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the District of Western District of New York, as well as a statement of all material evidence and information currently in its possession and of which he is the original source. These statements are supported

by material evidence known to the Relator at the time of filing, establishing the existence of Defendant's false claims. Because the statements include attorney-client communications and work product of Relator's attorneys and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

9.      Relator is not aware that the allegations in this Complaint have been publicly disclosed. Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## **BACKGROUND**

### *Medicare*

10.      Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare, and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter and administer contracts with insurance companies or contractors on behalf of HHS. Included in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

### *Medicaid*

11.      Medicaid is a joint federal/state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's

Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

12.    The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

### *Other Government Programs*

13.    TRICARE, formerly known as CHAMPUS, is a managed health care program established by the Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, including active duty service members, retired service members, and their dependents.  The Federal Employees Health Benefits Program provides health benefits to certain federal employees, certain tribes employees, tribal organizations and urban Indian organizations.

### *The United States False Claims Act*

14.    The United States False Claims Act prohibits, *inter alia*, the following:

> knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval;

> knowingly making or using (or causing to be made or used) a false record or statement material to a false or fraudulent claim; and

> knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government.

31 U.S.C. § 3729(a)(1)(A), (B) and (G).

15.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, Sec. 701, False Claims Act civil penalties were increased to a minimum of $10,781 and a maximum of $21,563 for violations occurring on or after November 2, 2015. *See also* 28 C.F.R. § 85.5.

16.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

### *The Anti-Kickback Statute*

17.     The Anti-Kickback Statute  prohibits offering to pay or paying any remuneration (including any kickback, bribe, or rebate) to any person to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), cert denied, 474 U.S. 988 (1985).  In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

18.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(b). The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C § 1320a-7a(a)(7).

19.     The False Claims Act provides a vehicle whereby individuals may bring qui tam actions alleging violations of the Anti-Kickback Statute. *See* 31 U.S.C. §§ 3729–3733.

20.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.").

21.     Congress amended the Anti-Kickback Statute in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an

individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

### *The United States Food, Drug and Cosmetic Act*

22.     The Food and Drug Administration ("FDA") regulates the manufacture, sale, and distribution of drugs and devices in the United States under the authority of the United States Food, Drug and Cosmetic Act ("FDCA"). The FDCA establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States.  This authority includes oversight of promotional labeling and advertising for prescription drugs.  21 U.S.C. § 502.  The FDCA defines "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article . . . ." 21 U.S.C. § 321(k).  "Labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

23.     The FDCA also subjects advertising for prescription drugs and restricted devices to the disclosure of risk and other informational requirements.  Advertisements for prescription drugs must include, among other things, "information in brief summary relating to side effects, contraindications, and effectiveness," as specified in FDA regulations.  21 U.S.C. § 352(n). Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications . . . ."  21 U.S.C. § 352(r).  Prescription drug advertisements also must not be false or misleading.  21 U.S.C. § 352(q)() & 321(n); 21 C.F.R. § 202.1(e)(5).

24.     The regulatory authority establishing government sponsored drug programs do not cover drugs used for off-label indications unless such off-label use is proven medically necessary

and safe and effective by medical literature, national organizations, or technology assessment bodies. See, e.g., 32 C.F.R. § 199.4(g)(15)(i)(A).

## DEFENDANT'S FRAUDULENT SCHEME

25.    Biohaven is engaged in a scheme whereby it showers medical providers with unlawful economic inducements, unsubstantiated efficacy claims, and other misinformation to induce providers to prescribe and government program beneficiaries to order, the Company's only drug: Nurtec (Rimegepant 75 mg), a migraine treatment prescription medication.

26.    By way of background, migraine attacks occur when the body releases the protein calcitonin gene-related peptide ("CGRP"), causing intense inflammation in the meninges (brain covering) and consequent intense pain. Nurtec is an orally disintegrating tablet-form ("ODT") CGRP antagonist designed for the acute treatment of migraine attacks. The Food and Drug Administration ("FDA") approved Nurtec for usage on February 27, 2020, adding Nurtec (and Biohaven) to the crowded, nearly $2B per year, migraine relief prescription drug market.

27.    Still, Nurtec sales immediately reached staggering levels. Despite launching halfway through its first financial quarter, Biohaven saw Nurtec sales exceed $1.2M by March 31, 2020 (*i.e.* just six weeks), with over 1,000 health care providers writing more than 6,000 prescriptions—"the greatest week-over-week growth for new acute migraine treatments during that time period."[2] Biohaven's success continued into its second financial quarter, with Nurtec netting $9.7M between April 1 and June 30, 2020, which was sufficient to render the drug "NBRx market leader," an industry benchmark representing the best-selling "new to brand" drug.[3] On November 9, 2020, Biohaven announced that, between Nurtec's February 27 launch and

---

[2] Biohaven press release filed with the Securities Exchange Commission ("SEC") on Form 8-K on May 7, 2020.
[3] *See* Biohaven press release filed with the SEC on Form 8-K on August 10, 2020.

September 30, the drug had "attain[ed] more than 220,000 prescriptions written by over 20,000 health care providers . . ." reaching net revenues from sales of $17.7M in the third quarter alone.[4]

28.    On January 25, 2021, the Company reported $35 million in net product revenue from Nurtec sales in the fourth quarter of 2020, an increase of approximately 98% from the previous quarter.[5]  Biohaven further announced that total prescriptions of Nurtec for the full year 2020 totaled over 337,000, with over 24,000 unique prescribers. *Id.* There were no material changes in channel inventory between the third and fourth quarter.  *Id.*  Commenting on the results, Vlad Coric, M.D., Chief Executive Officer of Biohaven, for example, stated, "The impressive market growth of Nurtec ODT reflects the significant unmet need that exists for patients suffering from the debilitating effects of acute migraine, our strong commercial and managed markets team, and the differentiated product label compared to competitors. We're proud of our commercial and R&D team members who have been dedicated to delivering this important medication to patients despite the challenges of the past year."  *Id.*

29.    Although official figures are not yet available, historic averages suggest that government programs will have paid for approximately 23% of Nurtec's 2020 $63.6M in sales, or $14.6M.[6]

30.    On April 7, 2021, Biohaven announced it had achieved "$43.8 million in net product revenue from sales of NURTEC ODT in the first quarter of 2021. Total prescriptions of NURTEC ODT from product launch to date (as of March 31, 2021) were over 500,000, with over 30,000 unique prescribers, attributing its success "to the significant unmet need that exists for

---

[4] *See* Biohaven press release filed with the SEC on Form 8-K on November 9, 2020.
[5] *See* Biohaven press release filed with the SEC on Form 8-K on January 25, 2021.
[6] *U.S. Health Care Spending by Payer and Health Condition, 1996-2016*, JAMA. 2020; 323(9):863-884.

patients suffering from the debilitating effects of acute migraine, our strong commercial and managed markets team, and the differentiated product label compared to competitors. . ."[7]

31.    On July 7, 2021, Biohaven announced "$93.0 million in net product revenue from sales of NURTEC ODT in the second quarter of 2021" and that "[t]otal prescriptions of NURTEC ODT from product launch to date (as of June 30, 2021) were over 750,000, with approximately 38,000 unique prescribers."[8]

32.    While Biohaven publicly attributes its success to hard work and Nurtec being the only ODT-formulation available, in reality the Company has been achieving these results by marketing the drug illegally since its launch.  As more fully discussed below, Biohaven knowingly provides remuneration in the form of improper speaker program honoraria; ad hoc kickbacks; electronic health record software cost assistance; and copay cards to induce providers to prescribe, and beneficiaries to order Nurtec. These *quid quo pro* arrangements violate the Anti-Kickback Statute because they involve providing financial benefits in return for referrals of business, which result in reimbursement from federal health care programs.

33.    As a result of this *quid quo pro* arrangement, claims for Nurtec, which were tainted by unlawful kickbacks, have been and continue to be submitted to and paid by federal health care programs in violation of the FCA.  Biohaven also knowingly misrepresents Nurtec's efficacy to the same end.

34.    According to Relator, Biohaven senior management openly discusses that the goal is to quickly and aggressively grow Nurtec into a billion-dollar drug at all costs so they can profit enormously from their stock options at the sale of the company.  Relator maintains that because of

---

[7] *See* Biohaven press release filed with the SEC on Form 8-K on April 7, 2021.
[8] *See* Biohaven press release filed with the SEC on Form 8-K on July 7, 2021.

the actions and direction of Biohaven leadership, she believes the company is willing to do anything to that end, including the unethical and illegal activities listed below

### A.    .Speaker Program Honoraria as Kickbacks

35.    Biohaven's main method of driving growth is through sham speaker programs. Speaker programs are events at which health care professionals speak or present to other professionals about a drug, device, or disease state on behalf of a sponsoring company. The company generally pays the speaker in the form of an honorarium and provides further remuneration through free meals to the attendees.  The purpose of speaker programs is to "help educate and inform other health care professionals about the benefits, risks and appropriate uses of company medicines."[9]  Still, speaker programs violate the Anti-Kickback Statute where, as here, companies sponsor them intending to induce providers to prescribe its products.

36.    Indeed, on November 16, 2020, the Department of Health and Human Services Office of the Inspector General ("HHS-OIG") issued a Special Fraud Alert, explaining "OIG is skeptical about the educational value of such programs. Our investigations have revealed that, often, HCPs [health care professionals] receive generous compensation to speak at programs offered under circumstances that are not conducive to learning or to speak to audience members who have no legitimate reason to attend" (HHS-OIG *Special Fraud Alert: Speaker Programs* at 1) and that:

> OIG has significant concerns about companies offering or paying remuneration (and HCPs soliciting or receiving remuneration) in connection with speaker programs. Based on our investigations and enforcement actions, this remuneration is often offered or paid to induce (or solicited or received in return for) ordering or prescribing items paid for by Federal health care programs. If the requisite intent

---

[9]  Pharmaceutical Research and Manufacturers of America ("PhRMA") Code on Interactions with Health Care Professionals ("PhRMA Code").

is present, both the company and the HCPs may be subject to criminal, civil, and administrative enforcement actions.

*Id.* at 5.

37.    The following characteristics are among those indicative of fraudulent speaker programs:

- The company sponsors speaker programs where little or no substantive information is actually presented;
- The program is held at a location that is not conducive to the exchange of educational information (e.g., restaurants or entertainment or sports venues);
- The company sponsors a large number of programs on the same or substantially the same topic or product, especially in situations involving no recent substantive change in relevant information; There has been a significant period of time with no new medical or scientific information nor a new FDA-approved or cleared indication for the product;
- HCPs attend programs on the same or substantially the same topics more than once (as either a repeat attendee or as an attendee after being a speaker on the same or substantially the same topic);
- Attendees include individuals who don't have a legitimate business reason to attend the program, including, for example, friends, significant others, or family members of the speaker or HCP attendee; employees or medical professionals who are members of the speaker's own medical practice; staff of facilities for which the speaker is a medical director; and other individuals with no use for the information;
- The company's sales or marketing business units influence the selection of speakers or the company selects HCP speakers or attendees based on past or expected revenue that the speakers or attendees have or will generate by prescribing or ordering the company's product(s) (*e.g.*, a return on investment analysis is considered in identifying participants);
- The company pays HCP speakers more than fair market value for the speaking service or pays compensation that takes into account the volume or value of past business generated or potential future business generated by the HCPs.

*Id.* at 6.

38.    Biohaven's speaker program seems to use this list of "no-noes" as its speaker program blueprint. From mid-March through August 6, 2020, Biohaven sponsored 1,291 speaker programs, with 384 of the 440 providers that Biohaven trained as speakers having hosted a program, and an additional 14 providers with programs scheduled. According to Relator, Biohaven managers instructed sales representatives to use speaker programs and the associated payments, or

"honoraria," to entice its high target potential early adopters and top prescribers to prescribe Nurtec (or prescribe more of it).  In fact, Biohaven's senior management reprimands Nurtec sales representatives who do not spend at least $5,000 on virtual speaker programs (including lunch & learns, breakfasts, office snacks) per month, even during the COVID-19 quarantine. Because most sales territories nationwide have two sales representatives, the actual minimum budget per sales territory is actually $10,000. Despite attendance at virtual and in-person programs being extremely low or nonexistent due to the pandemic, sales representatives are expected to host the programs in order to pay speaker honoraria in the range of $1,125 - $5,000 per talk, to reward them for being early adopters prescribing Nurtec. In other words, Biohaven's high number of speaker programs is no accident or coincidence.

39.    Speakers did not need to be thought leaders or influencers (or even engaging), as the intent of Biohaven's programs was and is to pay top prescribers, not to provide quality information with an educational impact. At the core, Biohaven's program is designed to "create brand evangelists" to drive sales, according to Senior Vice President of Marketing Graham Goodrich, explaining during a September 16, 2020 national sales call that:

> Are people willing to advocate on our behalf? Well transformative experiences with our brand create brand evangelists. We saw the engine [paid speaker programs] that we've put into place to capitalize on that. And those are real, we are not seeing the same engine and we're not seeing the same type of effect with [competitor] ubrogepant (Ubrelvy) . . .

40.    As discussed below, Biohaven continued to book and pay these "brand evangelists" to repeatedly speak simply because they were or could be top prescribers (often in spite of COVID-19 restrictions), paying hundreds of thousands of dollars in speaker honoraria, notwithstanding that the programs presented the same information repeatedly to the same audience, regularly light

on prescribers who actually could benefit while heavy on those who could not, including the speaker's own office staff.

41.     Biohaven's scheme paid off. Nurtec achieved a 42% market share in just three months.

### 1.    Top Providers and Targets Get the Speaking Engagements

42.     Program quality and education are not the goals of Biohaven's speaker programs—rewarding prescribers for endorsing and prescribing Nurtec are their reason for being. As such, Biohaven utilizes the same physicians repeatedly to "educate" on Nurtec. The following Biohaven document lists the Company's most utilized speakers from Mid-March – July, 2020:



43.     Next, the following summarizes other Biohaven internal documents, listing 54 providers from Biohaven's speaker roster and frequency report that Biohaven has paid to speak

about Nurtec more than 10 times each from March – Sept. 2020. Six of the 54 providers listed below (highlighted in yellow) have been paid for a Nurtec talk over 20 times from March to September 2020:

| | NAME | Email | LOCATION | COMPLETED | BOOKED | TOTAL |
|---|---|---|---|---|---|---|
| 1 | Michael Ament, MD | michaela@cherrycreekneurology.com | Denver, CO | 15 | 0 | 15 |
| 2 | Mehdi Ansarinia, MD | medhilv@yahoo.com | Las Vegas, NV | 11 | 4 | 15 |
| 3 | Charles Argoff, MD | charles.argoff@gmail.com | Albany, NY | 9 | 1 | 10 |
| 4 | Bulent Atac, MD | drbatac@aol.com | Bronx, NY | 14 | 5 | 19 |
| 5 | Ashima Bahl, APRN | Ashimab730@gmail.com | St. Petersburg, FL | 8 | 2 | 10 |
| 6 | Casilda Balmaceda, MD | casibalmacedamd@gmail.com | Bronx, NY | 9 | 3 | 12 |
| 7 | Vanessa Beard-Ely, PA | v.beard@comcast.net | Provo, UT | 13 | 5 | 18 |
| 8 | Steve Felix Belinga, MD | drbelinga@belclin.com | Fort Smith, AR | 9 | 2 | 11 |
| 9 | John Chawluk, MD | john.chawluk@outlook.com | Reading, PA | 9 | 4 | 13 |
| 10 | Jennifer Chester, FNP | jennifer.chester@hcamidwest.com | Kansas City, MO | 9 | 1 | 10 |
| 11 | Warren Chumley, MD | wfchum@yahoo.com | Lexington, KY | 14 | 0 | 14 |
| 12 | Diane R. Counce, MD | dcounce@councemd.com | Birmingham, AL | 16 | 5 | 21 |
| 13 | Brett Dees, MD | jdees@cox.net | Oklahoma City, OK | 11 | 2 | 13 |
| 14 | Merle Diamond, MD | mdiamond@diamondheadache.com | Evanston, IL | 16 | 1 | 17 |
| 15 | Maria Dolgovina, MD | drdolgovina@advmedny.com | Queens, NY | 21 | 0 | 21 |
| 16 | Jaclyn R. Duvall, MD | Jaclyn.duvall@hillcrest.com | Tulsa, OK | 13 | 2 | 15 |
| 17 | Eric Eross, DO | ericeross@yahoo.com | Phoenix, AZ | 55 | 6 | 61 |
| 18 | Justin C. Graff, MD | jcgraff@bellsouth.net | Tupelo, MS | 12 | 0 | 12 |
| 19 | Jeff Groves, MD | jeffgroves@reverehealth.com | Provo, UT | 14 | 6 | 20 |
| 20 | Christine Hagen, MD | ljopling@hotmail.com | Kernersville, NC | 12 | 0 | 12 |
| 21 | Darry Johnson, MD | darryscott@yahoo.com | Cave Creek, AZ | 12 | 1 | 13 |
| 22 | Shivang Joshi, MD | shivangj@gmail.com | Amherst, NY | 13 | 4 | 17 |
| 23 | Daniel Kassicieh, DO | sarasotaneurology@gmail.com | Sarasota, FL | 7 | 3 | 10 |
| 24 | Alam Khan, MD | Neurologist313@hotmail.com | London, KY | 16 | 1 | 17 |
| 25 | Stephen Landy, MD | wesleyhead@aol.com | Tupelo, MS | 20 | 2 | 22 |
| 26 | Judy Lane, MD | jclmustang@comcast.net | Englewood, CO | 14 | 0 | 14 |
| 27 | Douglas Langford, MD | douglas.langford@reverehealth.com | Provo, UT | 8 | 4 | 12 |
| 28 | Hayden Long, MD | haydenclong@gmail.com | Mobile, AL | 12 | 2 | 14 |
| 29 | Kasra Maasumi, MD | kmaasumi@gmail.com | Loma Linda, CA | 9 | 2 | 11 |
| 30 | Tamara Miller, MD | millerpmichael@gmail.com | Fort Collins, CO | 12 | 3 | 15 |
| 31 | Barbara Jean Ottley, MD | bjottley@hotmail.com | Hays, KS | 9 | 2 | 11 |
| 32 | Allan Perel, MD | Allan.perel@yahoo.com | Staten Island, NY | 11 | 0 | 11 |
| 33 | Brian Plato, DO | brian.plato@gmail.com | Louisville, KY | 10 | 0 | 10 |
| 34 | Alan Rapoport, MD | alanrapoport@gmail.com | Los Angeles, CA | 11 | 3 | 14 |
| 35 | Santiago Restrepo, MD | srneuro@gmail.com | San Antonio, TX | 12 | 0 | 12 |
| 36 | Jeffrey Royce, MD | docjsrmd@gmail.com | Rockford, IL | 10 | 0 | 10 |
| 37 | Nicolas Saikali, MD | nick.saikali@gmail.com | Orchard Park, NY | 16 | 5 | 21 |
| 38 | Jack Schim, MD | jschim@neurocenter.com | Carlsbad, CA | 13 | 4 | 17 |
| 39 | Curtis P. Schreiber, MD | curtradio@aol.com | Bolivar, MO | 9 | 2 | 11 |
| 40 | Patricia Scripko, MD | pscripko@gmail.com | Baltimore, MD | 9 | 1 | 10 |
| 41 | Tad Seifert, MD | tad.seifert@nortonhealthcare.org | Louisville, KY | 10 | 0 | 10 |
| 42 | Ravi Shah, MD | ravicshah@hotmail.com | Parker, CO | 14 | 5 | 19 |
| 43 | Idan Sharon, MD | isharon@sharonneurology.com | NY, NY | 29 | 6 | 35 |
| 44 | Anthony Simchak, MD | acsimchak@sbcglobal.net | Avon, IN | 4 | 7 | 11 |
| 45 | Warren D. Spinner, DO | wdspinner@ymail.com | Port Jefferson St., NY | 10 | 2 | 12 |
| 46 | Eric F. Stakebake, PA | efstakebakepa@gmail.com | Clinton, UT | 8 | 2 | 10 |
| 47 | Katherine Standley, DO | katherinestandley@gmail.com | Wesley Chapel, FL | 11 | 5 | 16 |
| 48 | Wade Steeves, MD | ws@valleyneurology.org | Spokane Valley, WA | 8 | 3 | 11 |
| 49 | Martin Taylor, DO | taylordophd@gmail.com | New Albany, OH | 11 | 3 | 14 |
| 50 | Brad Torphy, MD | btorphy@chicagoheadache.com | Chicago, IL | 9 | 1 | 10 |

| | | | | | |
|---|---|---|---|---|---|
| 51 | Victoria Trott, PA-C | vpace2@gmail.com | Annapolis, MD | 10 | 0 | 10 |
| 52 | BK Vaught, MD | bkv@vaughtneurology.com | Beckley, WV | 13 | 1 | 14 |
| 53 | Val Warner, PA-C | warnval@gmail.com | Layton, UT | 11 | 0 | 11 |
| 54 | Wendy Wright, DNP | wendyarnp@aol.com | Amherst, NH | 10 | 2 | 12 |

44.     Biohaven's November 1, 2020, speaker roster and frequency report provided updated speaker utilization data for the following providers:

| | NAME | Email | LOCATION | COMPLETED | BOOKED | TOTAL |
|---|---|---|---|---|---|---|
| 12 | Diane R. Counce, MD | dcounce@councemd.com | Birmingham, AL | 21 | 1 | 22 |
| 14 | Merle Diamond, MD | mdiamond@diamondheadache.com | Evanston, IL | 17 | 0 | 17 |
| 15 | Maria Dolgovina, MD | drdolgovina@advmedny.com | Queens, NY | 22 | 8 | 30 |
| 17 | Eric Eross, DO | ericeross@yahoo.com | Phoenix, AZ | 59 | 2 | 61 |
| 22 | Shivang Joshi, MD | shivangj@yahoo.com | Amherst, NY | 14 | 5 | 19 |
| 24 | Alam Khan, MD | Neurologist313@hotmail.com | London, KY | 19 | 0 | 19 |
| 25 | Stephen Landy, MD | wesleyhead@aol.com | Tupelo, MS | 21 | 2 | 23 |
| 26 | Judy Lane, MD | jclmustang@comcast.net | Englewood, CO | 14 | 1 | 15 |
| 28 | Hayden Long, MD | haydenclong@gmail.com | Mobile, AL | 13 | 4 | 17 |
| 30 | Tamara Miller, MD | millerpmichael@gmail.com | Fort Collins, CO | 14 | 2 | 16 |
| 37 | Nicolas Saikali, MD | nick.saikali@gmail.com | Orchard Park, NY | 20 | 3 | 23 |
| 38 | Jack Schim, MD | jschim@neurocenter.com | Carlsbad, CA | 16 | 3 | 19 |
| 42 | Ravi Shah, MD | ravicshah@hotmail.com | Parker, CO | 19 | 2 | 21 |
| 43 | Idan Sharon, MD | isharon@sharonneurology.com | NY, NY | 32 | 7 | 39 |

45.     According to Relator, Biohaven pays its Nurtec speakers between $1,125 and $5,000 per speaking engagement, depending on their script potential. As such, Biohaven's speakers who completed 10 programs could make up to 50,000 in just six months from these programs. Six providers presented over 20 times during this period, with Eric Eross, D.O. leading the pack, *booked to speak 61 times in 8 months from March to November 1, 2020, earning a minimum of nearly $70,000. See supra.*

46.     Indeed, On August 7, 2020, Relator's District Manager Bob Wiles forwarded to Relator the email from the Long Island, NY district manager, Lisa Marie Tjan, to her sales team encouraging them to invite their top target doctors to one of Dr. Eross virtual speaker program, describing Dr. Eross as "one of the best speakers around" who "is currently capped out." In the email, Tjan states that the district manager in Tampa, Florida, Scott Rendeiro had "locked" Dr. Eross down for his "last" programs (because in just six months from March - August Dr. Eross

had already exceeded the number of speaking engagements allowed in a year). However, according to the Relator, Dr. Eross continued to be booked to speak because he prescribes a high volume of Nurtec and is willing to promote its off-label use as a preventative treatment.

47.    Close behind Dr. Eross is Dr. Idan Sharon, who had been paid for 32 programs by November 1, 2020, with seven additional programs booked through December 31, 2020.  *Id.* Providers from New York's Dent Neurologic Center (with Offices in Buffalo, Amherst, and Orchard Park, NY)("Dent") —including Drs. Shivang Joshi, Nicolas Saikali –have been paid to speak a combined total of over fifty times in March-September 2020 because the Dent is a "key target."

48.    Indeed, the Dent was so important to Nurtec's success that discussions among Biohaven and Dent providers began long before Nurtec received FDA approval.  For example, Dr. Nikolas Saikali met the district sales representatives and district manager Bob Wiles at the Hyatt Regency's bar in Buffalo, NY, following a district team meeting held at the hotel on Monday January 13, 2020, six weeks before Nurtec was approved and openly discussed Nurtec with Wiles and the district sales team. Earlier that day, during a Nurtec sales meeting in Buffalo, NY, the Buffalo sales district team (headed by Wiles) served meals at the NPO Friends of the Night People food pantry because Dr. Saikali and the Dent are ardent supporters of the NPO and Wiles believed this would put Nurtec in favor with the Dent. On February 6, 2020 (prior to Nurtec's FDA approval) Buffalo area sales representative Jeff Gaj texted the entire sales district, announcing that Dr. Sailkali, then a top target provider at the Dent, was already scheduled for dinner programs in their district and was available for more. This resulted from Biohaven having trained its speakers in January 2020, enabling Biohaven to prematurely inform these potential top prescribers about Nurtec so they could begin prescribing it as soon as it was approved. In fact, Wiles required all the

sales representatives in his sales district to schedule at least three speaker programs within the first month of the Nurtec sales launch.

49.    Indeed, Biohaven became so quickly and thoroughly cozy with key opinion leaders and thus soon-to-be speakers that its representatives were able to petition them to write letters in support of FDA approval to the agency as far back as November 2019, according to Relator.

50.    Dr. Charles Argoff, a neurologist in Albany, New York affiliated with Albany Medical Center, is another important "evangelist." Between March and September 2020, Biohaven paid Dr. Argoff to speak ten times, earning him thousands of quick dollars. *Supra*. And for good reason. Not only is Dr. Argoff a high prescriber, but he also evangelizes to investors in news forums and phone calls. According to Goodrich during a Sept. 16, 2020 national sales call:

> Dr. (Charles) Argoff Albany, NY, Nicole Montgomery (sales representative) sent me a wonder text 'very difficult patient, hadn't experienced Nurtec, nothing else worked, had a transformative experience.' What did Dr. Argoff do? Well he was on FirstPharma as a KOL talking about that was his experience? And his experience is like the testimonial I just shared with you – he has a 70% preference share to Nurtec. He's also on the phone with a variety of investors on a weekly basis – there were two last week – talking about his experience. So it not only matters in the prescribing world but it also matters in the financial world so you want to keep up that advocacy.
>
> *          *          *
>
> the sum of all of this should be and the conclusion should be we are very well positioned from share of voice, promotional influence, the ability to differentiate, the experience people are having with our product and the degree to which they are willing to advocate.

51.    Dr. Argoff also gave Nurtec glowing reviews in interviews including in FirstWordPharma.com in an effort to lure providers and investors to Biohaven, while failing to disclose that he is a paid speaker who has already profited from speaking about Nurtec in the six months from mid-March to August 7, 2020.

### 2.    Biohaven Lies About its Speaking Engagement Payments

52.    Biohaven now attempts to hide the number and payments it made to speakers to cover up its *quid pro quo* activities. Biohaven is required by federal law to report all payments made to prescribers for the entire year in the first reporting period the following year. Notwithstanding the actual data contained in Biohaven's internal documents, the Company reported to CMS only approximately ten percent of the payments made to each of the speakers in order to prolong its scheme.  For example, the following six prescribers were the top paid speakers from mid-March 2020 to September 25, 2020:

| **Eric Eross, DO, Neurologist**<br>4530 E Muirwood Dr Ste 111, Phoenix, AZ 85048, ericeross@yahoo.com<br>Nurtec ODT Sales Representatives: Janelle Poole, Matt Thumann | | | |
|---|---|---|---|
| **ACTUAL PAID PROGRAMS TOTAL**<br>**January 1, 2020 to December 31, 2020[a]** | | **Reported to CMS OPEN PAYMENTS**<br>**January 1, 2020 to December 31, 2020[b]** | **Underreported by Biohaven** |
| **Total # of paid speaker programs:** | **61** | **Total # of paid speaker programs:**  **3** | **Speaking Engagements underreported by:** |
| Past – Held 1/1/20 – 11/1/20: | 59 | (1) 12/3/20 Nurtec ODT Speaker Honoraria $1500<br>(2) 12/15/20 Nurtec ODT Consulting Fee $2000<br>(3) 12/17/20 Nurtec ODT Consulting Fee $1200 | **58** |
| Future–Booked 11/1/20 – 12/31/20: | 2 | | **Total Speaker Payments underreported by:** |
| Avg. Low Speaker Honoraria: $1500<br>**Approx. Total paid (61 Programs): $91,500** | | **Total Speaker Payments reported to CMS: $4,700** | **$86,800** |
| [a] *From Biohaven Internal Documents (see, Ex 3a to Ex 5q) updated as of November 1, 2020*<br>[b] *From CMS OPENPAYMENTS https://openpaymentsdata.cms.gov/physician/48514* | | | |

| **Idan Sharon, MD, Neurologist**<br>6917 Shore Rd, Brooklyn, NY   11209, isharon@sharonneurology.com<br>Nurtec ODT Sales Representatives: Chris Pruss, Maria Sarkissian | | | |
|---|---|---|---|
| **ACTUAL PAID PROGRAMS TOTAL**<br>**January 1, 2020 to December 31, 2020[a]** | | **Reported to CMS OPEN PAYMENTS**<br>**January 1, 2020 to December 31, 2020[b]** | **Underreported by Biohaven** |
| **Total # of paid speaker programs:** | **39** | **Total # of paid speaker programs:**  **5** | **Speaking Engagements underreported by:** |
| Past – Held 1/1/20 – 11/1/20: | 32 | (1) 12/3/20 Nurtec ODT Speaker Honoraria $2250<br>(2) 12/7/20 Nurtec ODT Speaker Honoraria $1125<br>(3) 12/14/20 Nurtec ODT Speaker Honoraria $1125 | **34** |
| Future–Booked 11/1/20 – 12/31/20: | 7 | (4) 12/15/20 Nurtec ODT Consulting Fee $2000<br>(5) 12/21/20 Nurtec ODT Speaker Honoraria $1125 | **Total Speaker Payments underreported by:** |
| Avg. Low Speaker Honoraria: $1125<br>**Approx. Total paid (61 Programs): $43,875** | | **Total Speaker Payments reported to CMS: $7,625** | **$36,250** |
| [a] *From Biohaven Internal Documents (see, Ex 3a to Ex 5q) updated as of November 1, 2020* | | | |

[b] *From CMS OPENPAYMENTS* *https://openpaymentsdata.cms.gov/physician/100410*

---

**Maria Dolgovina, MD, Neurologist**
10124 Queens Blvd Ste A, Forest Hills  , NY 11375, drdolgovina@advmedny.com
Nurtec ODT Sales Representative: Alina Lubarsky

| ACTUAL PAID PROGRAMS TOTAL<br>January 1, 2020  to December 31, 2020[a] | | Reported to CMS OPEN PAYMENTS<br>January 1, 2020  to December 31, 2020[b] | | Underreported by Biohaven |
|---|---|---|---|---|
| Total # of paid speaker programs: | 30 | Total # of paid speaker programs: | 3 | Speaking Engagements underreported by:<br>27 |
| Past – Held 1/1/20 – 11/1/20: | 22 | (1) 12/3/20 Nurtec ODT Speaker Honoraria $1125<br>(2) 12/8/20 Nurtec ODT Speaker Honoraria $2250<br>(3) 12/10/20 Nurtec ODT Speaker Honoraria $2250 | | |
| Future–Booked 11/1/20 – 12/31/20: | 8 | | | Total Speaker Payments underreported by:<br>$28,125 |
| Avg. Low Speaker Honoraria: $1125<br>**Approx. Total paid (61 Programs): $33,750** | | **Total Speaker Payments reported to CMS:**<br>**$5,625** | | |

[a] *From Biohaven Internal Documents (see, Ex 3a to Ex 5q) updated as of November 1, 2020*
[b] *From CMS OPENPAYMENTS* *https://openpaymentsdata.cms.gov/physician/105389*

---

**Nicolas Saikali, MD, Neurologist**
3980 Sheridan Dr Fl 6   Dent Neurologic Group LLP, nick.saikali@gmail.com
Nurtec ODT Sales Representative: Jill Ruszczyk

| ACTUAL PAID PROGRAMS TOTAL<br>January 1, 2020  to December 31, 2020[a] | | Reported to CMS OPEN PAYMENTS<br>January 1, 2020  to December 31, 2020[b] | | Underreported by Biohaven |
|---|---|---|---|---|
| Total # of paid speaker programs: | 23 | Total # of paid speaker programs: | 2 | Speaking Engagements underreported by:<br>21 |
| Past – Held 1/1/20 – 11/1/20: | 20 | (1) 12/9/20 Nurtec ODT Speaker Honoraria $2000<br>(2) 12/18/20 Nurtec ODT Speaker Honoraria $1500 | | |
| Future–Booked 11/1/20 – 12/31/20: | 3 | | | Total Speaker Payments underreported by:<br>$31,000 |
| Avg. Low Speaker Honoraria: $1500<br>**Approx. Total paid (61 Programs): $34,500** | | **Total Speaker Payments reported to CMS:**<br>**$3,500** | | |

[a] *From Biohaven Internal Documents (see, Ex 3a to Ex 5q) updated as of November 1, 2020*
[b] *From CMS OPENPAYMENTS* *https://openpaymentsdata.cms.gov/physician/264689*

---

**Stephen Landy, MD, Neurologist**
311 S Gloster St Ste 103 Tupelo, MS    38801, wesleyhead@aol.com
Nurtec ODT Sales Representatives: Keith Latham, Natalie Breeden

| ACTUAL PAID PROGRAMS TOTAL<br>January 1, 2020  to December 31, 2020[a] | | Reported to CMS OPEN PAYMENTS<br>January 1, 2020  to December 31, 2020[b] | | Underreported by Biohaven |
|---|---|---|---|---|
| Total # of paid speaker programs: | 23 | Total # of paid speaker programs: | 3 | Speaking Engagements underreported by:<br>20 |
| Past – Held 1/1/20 – 11/1/20: | 21 | (1) 12/15/20 Nurtec ODT Consulting Fee $2000<br>(2) 12/15/20 Nurtec ODT Speaker Honoraria $2500<br>(3) 12/17/20 Nurtec ODT Speaker Honoraria $2000 | | |

| Future–Booked 11/1/20 – 12/31/20: | 2 | | Total Speaker Payments underreported by: |
| Avg. Low Speaker Honoraria: $2000 **Approx. Total paid (61 Programs): $46,000** | | **Total Speaker Payments reported to CMS: $6,500** | **$39,500** |
| [a] *From Biohaven Internal Documents (see, Ex 3a to Ex 5q) updated as of November 1, 2020* [b] *From CMS OPENPAYMENTS https://openpaymentsdata.cms.gov/physician/205064* | | | |

**Diane R. Counce, MD, Neurologist**
1000 Southlake Park Ste 200     Suite 400B, Birmingham, AL 35244, dcounce@councemd.com
Nurtec ODT Sales Representatives: Lynnette Johnson, Kalika (sp?) Gibbons

| ACTUAL PAID PROGRAMS TOTAL January 1, 2020 to December 31, 2020[a] | | Reported to CMS OPEN PAYMENTS January 1, 2020 to December 31, 2020[b] | Underreported by Biohaven |
| --- | --- | --- | --- |
| Total # of paid speaker programs: | 22 | Total # of paid speaker programs:    1 | Speaking Engagements underreported by: 21 |
| Past – Held 1/1/20 – 11/1/20: | 21 | (1) 12/15/20 Nurtec ODT Consulting Fee $2000 | |
| Future–Booked 11/1/20 – 12/31/20: | 1 | | Total Speaker Payments underreported by: $42,000 |
| Avg. Low Speaker Honoraria: $2000 **Approx. Total paid (61 Programs): $44,000** | | **Total Speaker Payments reported to CMS: $2,000** | |
| [a] *From Biohaven Internal Documents (see, Ex 3a to Ex 5q) updated as of November 1, 2020* [b] *From CMS OPENPAYMENTS https://openpaymentsdata.cms.gov/physician/290771* | | | |

53.     The tables illustrate the discrepancy between how many times the prescriber was actually paid to speak by Biohaven and what Biohaven reported.  In fact, Biohaven failed to report to the Government any payments at all other than those that were in December 2020 allowing it, in theory, to hide its *quid pro quo* arrangement, evincing its scienter.  That is, according to the payment data Biohaven reported to CMS, in one month (December 2020) alone, they made 239 payments, for a total of $372,484.50, to Providers for speaking and consulting about Nurtec.

**3.     Speakers Present No New Information and to Wrong Audience**

54.     Further evincing the impropriety of Biohaven's speaker programs are the facts that its speakers presented an inordinately high number of programs on the same product where there

has been no new medical or scientific information and presented them primarily to non-target providers and other staff.

55.     For example, despite there being no new meaningful information to present, the presentations continued using all the same players. According to Biohaven documents, eighty-five of the 205 virtual programs Biohaven held in the northeastern U.S. between April and July 2020, for example, occurred in the Long Island, NY territory.

56.     According to Relator, virtual programs are held Monday through Thursday evenings because it is difficult to get prescribers to participate on the weekends or holidays. Therefore, in April 2020, there were 18 possible evenings to host virtual programs. Still, the Long Island territory sales representative hosted 17 virtual programs where a speaker was paid and food provided for the viewers. In May 2020, the Long Island representative hosted 14 virtual programs in 15 possible evenings. In June 2020, there were only 18 possible evenings to host virtual programs.  Nevertheless, the Long Island territory sales representative hosted 22 virtual programs where a speaker was paid and food provided for the viewers. In July 2020, the Long Island representative held 18 virtual programs on 18 possible evenings. *See id*. Relator maintains that it is unrealistic, to say the least, to be able to drive enough attendance to host legitimate virtual programs so frequently, particularly where no new information is available. This supports Relator's allegation that Biohaven was not concerned with quality attendance and the educational impact of the programs and that the intent of the programs was to pay their top prescribers.

57.     Nor was Biohaven concerned with the audience to whom its presenters spoke. "Attendees" did not have to be people in a position to benefit from the information, or even be present, in many situations. Biohaven paid speaker honoraria for virtual programs where the attendance often consisted mainly of non-prescribers or non-targets. According to Relator,

Biohaven allowed the Nurtec reps to invite office staff, medical students, and pharmacy students to the programs, and allowed its sales reps to fill-in the attendance sign-in sheets with no signatures from attendees, to falsely inflate the attendance and justify the speaker honoraria they paid to top prescribers.

58.     These medical students, pharmacy students, and office staff recruited to attend programs – basically as "seat fillers," further demonstrates that the speaker programs were a vehicle to pay honoraria to top prescribers/early adopters to reward them. Relator personally attended 2-3 programs where the only attendees were from the speakers' personal office.  For example, on August 25, 2020, Biohaven paid a high prescribing physicians' assistant to speak to two health care providers and two medical students.  This marked the seventh time the physician's assistant had been paid for speaking since March 2020. Indeed, between February 2020 and August 6, 2020, Biohaven paid for and hosted 1,291 speaker programs; however, they collected only 1269 attendance sheets.  These programs purportedly reached 12,035 attendees, of which over 60% were employees who lacked the ability to prescribe any medication ("Non-Prescribers") or providers who typically would not treat migraines or otherwise prescribe drugs in Nurtec's drug category ("Non-Targets"), according to Biohaven documents.  From mid-March 2020 to July 16, 2020, Biohaven held 1,091 virtual speaker programs (but collected mandatory attendance record sheets for 1081).  *Id.*  During this period, Biohaven paid for food for 10,370 attendees, of which 6,011 were either Non-Prescribers or Non-Targets.  *Id.*

59.     Then, from July 20 – 23, 2020, Biohaven held 64 Nurtec virtual speaker programs, collecting only 57 attendance sheets. *Id.* The attendance sheets listed 496 attendees, of which only 182 were target providers, and 314 were non-providers (213) or non-target providers (101), resulting in averages of 7.75 attendees per program, of which 2.8 attendees were target providers.

*Id.* From July 27 to July 30, 2020, Biohaven held 77 Nurtec virtual speaker programs, collecting only 71 attendance sheets. *Id.* The attendance sheets listed 636 attendees, of which only 231 were target providers and 405 were non-providers (248) or non-target providers (157) resulting in averages of 8.26 attendees per program, of which 3.0 attendees per program were target providers. *Id.* From August 3 to August 6, 2020, Biohaven held 59 Nurtec virtual speaker programs, collecting 60 attendance sheets (sic). *Id.* The attendance sheets listed 533 attendees, of which only 204 were target providers and 329 were non-providers (209) or non-target providers (120), resulting in averages of 9 attendees per program, of which 3.4 attendees per program were target providers. *Id.*

60.     Further, due to the pandemic, these were virtual programs which made it easy for attendees to get a free meal and not truly participate in the program.

61.     As mentioned above, these high numbers are no coincidence. Biohaven management acknowledged and preached the importance of speaker programs and their ability to increase prescription writing. For example, on August 7, 2020, despite the then raging pandemic, Relator's manager's chief of staff, Matt Bartolo, texted the NY representatives that "several territories that have seen substantial growth have been doing out of office (restaurants) speaker programs. Bob [Wile, District Manager] would like us to start utilizing them . . ." Indeed, Biohaven's senior management would reprimand Nurtec sales representatives—often two per territory—who did not spend their full budgets on programs per month, even during COVID-19 quarantine. In spite of provider attendance at virtual and in-person programs being extremely low or nonexistent due to the pandemic sales representatives are expected to host the programs in order to pay speaker honoraria in the range of $1,500 - $5,000 to the speakers per talk to reward them for being early adopters prescribing Nurtec.

62.     In fact, Relator was expected to host virtual speaker programs and pay the speaker even when there were no prescribers in attendance. Sales representatives were instructed to invite anyone from the medical offices, including Non-prescribers, pharmacists, and even pharmacy students (anyone who engages inpatient care – from the receptionist to the provider) to attend the virtual programs just so that they could justify paying the speaker and have names to put on the sign-in sheet to justify the food costs even though most attendees would often be non- prescribers. For example, Biohaven management instructed Relator to hold a virtual dinner program on September 1, 2020 even though no providers were signed up to attend so as not to disappoint (*i.e.* not pay) the speaker, physicians' assistant Brandon Yehl, a top prescriber. The actual attendees were Wendy Ruth (speaker's office staff), Cadhan McFadden and Alexi Taskovski (pharmacy students), and Matthew Tennyson (pharmacy intern). None of the attendees could benefit from the program presentation (or even drive  the business forward); thus, the whole purpose of holding the program was to pay Yehl.

63.     Further, Relator knows that sales representatives have forged providers' names or handed in the sign-in sheets with names but no signatures, particularly for virtual programs, because obtaining signatures is "too difficult" and/or to justify the cost and make it appear that the cost was adhering to fair market value requirements.

64.     As above, Biohaven's own reports set forth the number of paid speaker programs versus the number of attendance sheets submitted and there is always a significant discrepancy between the number of programs held and the much fewer attendance sheets submitted. This serves to falsely inflate the average attendance at the programs, another way the Company endeavors to hide its scheme.

65.     According to Relator, Biohaven's Nurtec sales representatives openly praised the company for not being "as uptight" as other companies in terms of compliance.

66.     Biohaven also allows its sales representatives to hold impermissible "dine and dash" type dinner programs where they pay for full meals at popular restaurants that prescribers simply pick up for themselves and often their families to take home with the assumption that they would log in and watch the virtual speaker presentation. However, there is no way to know whether prescriber watches or listens to the virtual program. Biohaven also allows its sales representatives to order delivery services to pick up food from restaurants and deliver to the homes of prescribers to entice them to participate in Nurtec virtual programs.

67.     In fact, Relator witnessed business director Bernadette Raymond and district manager, Robert Wiles, encourage sales representatives to offer these home-delivery options to target providers in order to entice providers to participate and position Nurtec as their drug of choice for Migraine relief.

68.     Biohaven managers also instructed sales professionals to aggressively pursue potential high-volume Nurtec prescribers known to be prescribing competitor drugs for these purported remote speaking engagements.  Dr. Jennifer McVige, a top target provider from the Dent in Buffalo, NY, is a good example. Although, as of August 25, 2020, Biohaven had paid Dr. McVige to speak four times, Relator reports that both Wiles and Raymond put pressure on their district to use Dr. McVige more because she was not writing enough Nurtec perscriptions and was prescribing more of the competitor Ubrevly. Wiles and Raymond stated to the sales representatives that using the top target providers to speak more would positively influence their prescribing habits and result in them using more Nurtec.

69.     Further, the Nurtec sales representative in Syracuse, NY, Mike Woloszyn, specifically told Relator that the Buffalo, NY sales reps were told to book Dr. McVige to increase her prescribing of Nurtec.  In fact, Wiles pressed Relator to book Dr. McVige for speaker programs in her sales territory even if no providers wanted to attend or even in just one office in order to influence the speaker to prescribe more Nurtec.   For example, on May 1, 2020, Relator was forced to book Dr. McVige to speakat Dr. Laura Martin's Syracuse, NY office, despite the fact that only one (Dr. Martin) was a provider of the eleven participants. All of the other participants were Biohaven employees:

1.     Jennifer McVige – Speaker
2.     Tricia Frattasio – Relator/ Nurtec Sales Rep
3.     Jamie – SciMed Program Host
4.     Michael Woloszyn – Nurtec Sales Rep/ Co-Host
5.     Dr. Laura Martin – HCP Syracuse NY (1 actual participant)
6.     Daniel Franjic – Nurtec Medical Science Liason
7.     Gary Helak – Nurtec Sales Rep
8.     Jeff Gaj – Nurtec Sales Rep
9.     Jill Ruszczyk – Nurtec Sales Rep
10.    Robert Wiles – Nurtec District Manager
11.    13154204238 (Matt Bartolo) – Nurtec Sales Rep

**4.     Speaker Programs Used to Facilitate Off Label Marketing**

70.     To the extent these speaker program dinners provided any new information, it often amounted to illegal, off-label promotion.  The FDA approved Nurtec "for the acute treatment of migraine with or without aura in adults," noting that at the time the drug was "not indicated for the preventive treatment of migraine" and that "[t]he recommended dose is 75 mg taken orally, as needed. The maximum dose in a 24-hour period is 75 mg. The safety of treating more than 15 migraines in a 30-day period has not been established."   Despite this explicit approval and regulations prohibiting payment of claims for drugs marketed off label, Biohaven district managers regularly allowed sales representatives to prompt their paid speakers to go off of the approved

speaker presentation by asking the speaker-specific questions about his experience with Nurtec in order to lead the discussion, often leading to elicit off-label discussion.

71.     During the May 1, 2020, program discussed above, Biohaven sales representative for Buffalo, NY, Jeff Gaj specifically asked Dr. McVige to go off script and discuss her personal experiences with Nurtec in order to generate an off-label discussion, according to Relator.

72.     This is a well-crafted practice within Biohaven designed to sidestep FDA requirements that drugs be promoted only for approved uses.  On April 16, 2020, for example, Dr. Mohammed Qasaymeh from the Dent in Buffalo, NY, spoke at length regarding off-label use of Nurtec, not on his own accord, but in response to impermissible prompting by the sales representative concerning Nurtec's (unapproved) efficacy, safety, or tolerability qualities. Responding to prompting, Dr. Qasaymeh explains that he prescribes Nurtec to patients on anxiety medications over triptans because patients cannot develop Serotonin Syndrome on Nurtec, where they can on triptans.  In relevant part:

- 3:52 (Gary Helak Buffalo, NY North sales representative): I know you have like 5 PA's/NP's that work under you, do they share the same excitement for Nurtec ODT that you do?
- 4:02 (Qasaymeh): Yes, I mean again it's something we use when we feel this is the time to do it. If you're seeing a patient who has never been on any other medicine other than Tylenol, I got to tell you I don't start them on rimegepant (Nurtec) you know, we might start them on something very simple like an NSAID, long acting NSAID but then remember the worst of the worst come to our clinic so you are not going to get someone who gets one headache a year to come to see Neurologist, those are patients who are seen by their primary, but that's where rimegepant (Nurtec)  becomes an option for patients who have already tried all the NSAIDs on the market and they already tried one or two triptans before they see you so that's when those medications they force themselves into the equation whether you like them or not, they become an option that you have to consider.
- 5:20 (Jill Ruszczyk Buffalo, NY South sales representative): Now I know this probably isn't a realistic situation because of managed care but with what you just said, if you got to that point where you needed to go further than the NSAIDs and you have the option of a triptan or Nurtec ODT, just on your thoughts, what would your preference be even though managed care might not let you do it? [This question is intentionally posed to

provoke the speaker to consider prescribing Nurtec before trying triptans with a letter of medical necessity to push the prescription through the managed care PA process.]

- 5:44 (Qasaymeh): Well, I mean for me as a physician, the number one priority is to make sure that you treat the patient safely and with any medicine that they know doesn't have side effects that will be my first choice so you know the first rule of medicine that's back thousands of years was do no harm so when you give someone a medicine we're not trying to do any harm but the nature of medicine in general is that when you give the medicine there's a chance that side effects are gonna happen so what I like about rimegepant (Nurtec) is that I can close my eyes and write a script and know I did no mistakes here and 2% can feel nauseous and that's about it. And that to me is no harm so if we are in an ideal situation where we have an endless amount of rimegepant (Nurtec) I can use it - I would use it very, very early.

- 6:56 (Ruszczyk): Well I want to take you out on the road with me when we get back out there – take you to my accounts

- 7:07 (Qasaymeh): Here you go, Yes! Yeah, you know the thing is.. Now this is off track but I've been looking at all this and researching all this        - treatment with a CGRP treatment can have some, now this is again, this has to be studied, but there is potential for Neuroprotection, there is a potential for altering the course of the disease – its possibly it's not a bandaid. That something that we need to research. That's something I would be very very interested in involving into research. Now if we leave migraines untreated, they go into chronic migraines and they create all sorts of problems. Now if we use something like this [Nurtec] which alters the physiology of migraine, I would very interested to see how affective that would be into protecting the Neurons and the brain and the whole process of migraine. I think the future will bring many many options down the road.
  If you look just 6 years ago maybe seven years ago, the options were limited, there was no Botox, there was no CGRP treatments, even a year ago, I mean the first approach to CGRP treatment was made 2019 which is different from what you guys have but I'm just saying that the concept was only a year ago so who knows in five years it might – something might come up with those research that the first line of treatment  could be that this is what you have to do, you know? That would be interesting to study which is something I'm very interested in.

- 9:04 unknown sales representative): Doctor, what do you mean by Neuroprotection?

- 9:07 (Qasaymeh): Well Neuroprotection you know if a nerve keeps firing, by giving you pain or giving you seizure or by giving you anything from excessive firing of the nerve, that nerve gets exhausted and it goes unchecked and it fires more, in other words, it goes rogue. And if you can alter that process that would be fascinating.


73.    Biohaven's ability and willingness to steer providers like Dr. Oasaymeh into off label discussions such as here, where Dr. Oasaymeh is extolling Nurtec's unproven preventative and curative properties further demonstrate the Company's disregard for the laws it is required to follow and, therefore, its threat to public health programs.

74.     Biohaven further promotes a false and misleading off-label claim that Nurtec effectively relieves migraine pain in minutes when according to its package insert, it works in 2 hours. For example, on March 13, 2020, Wiles texted the entire sales team with a purported recent individual patient success story which he encouraged the representatives to share with "as many providers as you can. . ." despite there being no supporting studies, let alone FDA support, for encouraging providers to make such claims:



75.     This is false and misleading because the FDA approved drug label for Nurtec states specifically "The primary efficacy analyses were conducted in patients who treated a migraine with moderate to severe pain. NURTEC ODT 75 mg demonstrated an effect on pain freedom and most bothersome symptom (MBS) freedom at two hours after dosing, compared to placebo…the

percentage of patients achieving headache pain freedom and MBS freedom two hours after a single dose was statistically significantly greater in patients who received NURTEC ODT compared to those who received placebo." https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/212728s000lbl.pdf at 11; and "…statistically significant effects of NURTEC ODT compared to placebo were demonstrated for the additional efficacy endpoints of pain relief at 2 hours, sustained pain freedom 2-48 hours, use of rescue medication within 24 hours, and the percentage of patients reporting normal function at two hours after dosing (Table 2). Pain relief was defined as a reduction in migraine pain from moderate or severe severity to mild or none. The measurement of the percentage of patients reporting normal function at two hours after dosing was derived from a single item questionnaire, asking patients to select one response on a 4-point scale; normal function, mild impairment, severe impairment, or required bedrest." *Id.* at 13.

### B. Ad Hoc Kickbacks

76. As discussed above, Anti-Kickback Statute outlaws knowingly and willfully even offering to pay or soliciting any remuneration to induce or reward referrals of items or services reimbursable by a federal health care program. *See infra.* For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. *Id.* Arrangements where even one purpose of any remuneration involved is to obtain the referral of services or to induce further referrals violate the Anti-Kickback Statute. *See, e.g., United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), *cert. denied*, 474 U.S. 988 (1985).

77.     Indeed, the pharmaceutical industry in general—at least on paper—recognizes the serious risks involved in gifting anything of value to providers.  Since 2002, PhRMA has published and updated (in 2009) the PhRMA Code to reinforce the appropriate nature of interactions between industry participants and healthcare professionals. Most relevant here are the PhRMA Code's policies on providing meals and gifts to providers and their staff.[10]

78.     The PhRMA Code allows companies to supply a "modest" meal "occasionally," while making a scientific or clinical information presentation to healthcare professionals and their staff, provided that the modest and occasional meal is "offered in connection with informational presentations made by field sales representatives or their immediate managers should also be limited to in-office or in-hospital settings." The PhRMA Code also eliminated entertainment entirely in company/provider interactions—companies are prohibited from providing entertainment or recreation for healthcare professionals. The prohibition applies regardless of the relative value of the activity or whether it is secondary to the consultant or educational purpose of the meeting.

79.     Still, Biohaven showers providers, including staff, with a host of extras. Biohaven sales representatives are required to hold virtual and in-person "lunch and learns" However, due to COVID restrictions, it was nearly impossible for sales representatives to hold proper lunch programs, so Biohaven adopted a "blind eye" approach to the activity, while its sales representatives rampantly either sent or delivered lunch, deserts, snacks, etc. to prescriber offices without even attempting to provide any educational or "learn" portion of the lunch & learn.

---

[10] Of note, unlike the overwhelming majority of pharmaceutical companies, Biohaven does not appear to endorse, let alone be a signatory to, the PhRMA Code, instead opting to formulate its own "Code of Ethics" that encourages the provision of gifts long shunned by the industry almost as a whole.

Indeed, offices were permitted to order the food themselves with Biohaven simply footing the bill. Biohaven allowed and encouraged this illegal sales activity to go on because it proved to be successful in positioning Nurtec in the forefront of the prescribers' minds. In fact, on numerous occasions, Relator recalls her district and regional managers pointing out the correlation between high performing sales territories and high frequency of lunch & learns/paid speaker programs. Relator was reprimanded for not hosting enough lunch and learns even though Biohaven leadership was already aware that her sales territory was notoriously a "no free lunch" (no pharma access) territory even before the pandemic. Relator was instructed by her District Manager, Wiles, to enter more of her sales activities as lunch and learns even though he knew that while Relator may be able to drop off or have meals delivered to their offices, she would not be able to speak with any providers about Nurtec. Wiles specifically stated that "little white lies are okay."

80.    Biohaven documents demonstrate that in a one-week period in July 2020, during COVID-19, Relator's territory (Rochester, NY) had 0 lunch and learns.  But, the Buffalo, NY (S) territory had 13 lunch & learns, and the Buffalo, NY (N) territory had 12 lunch & learns. During this same week (Monday – Thursday) the Biohaven national average was ten lunch & learns per territory. This indicates that each sales representative held more than two lunch & learns per day, an impossible feat in the pharma world unless the sales representative is merely paying for lunch delivery and not providing the required educational portion of the proper approved lunch & learn activity.  Later in September, Biohaven's national average for lunch and learns was 13.  Relator's territory (Rochester, NY) had six lunch and learns; Buffalo, NY South territory had 16 lunch and learns; Buffalo, NY North territory had 29 lunch and learns; the Syracuse, NY territory had 21 lunch and learns and Ithaca, NY had 11.

81.    Similarly, in a one-week (Mon-Thurs) period in October 2020, during COVID-19, Biohaven national average was again 13 lunch & learns per territory.  For comparison, Relator hosted six lunch and learns.

82.    From October 1 through October 23, 2020, just 17 business days (13 excluding Fridays), Biohaven averaged 45 lunch & learns per territory.  Relator's territory (Rochester, NY) had 18 lunch and learns while the Buffalo, NY South territory had 45; the Buffalo, NY North territory had 98; the Syracuse, NY territory had 79 lunch and learns and Ithaca, NY had 40.  This indicates that each sales representative held more than 3.5 lunch and learns per day—again, impossible.

83.    Biohaven's promotions accomplished their goal of driving prescriptions, as the territories receiving the highest number of "lunch and learns" also generated the most Nurtec prescriptions, according to Biohaven documents.

84.     On many occasions, Biohaven sales professionals put little to no effort into creating the illusion of the "learning" portion of the lunch and learns.  Biohaven pays for and sends food trucks to pull up in front of the clinic, hospital, or office and allows the doctors, staff and inevitably patients, to order a free lunch. The sales representatives are allowed to hang a large Nurtec banner on the food truck (and ice cream trucks) in order to associate the benefit of the food truck with loyalty to prescribing/using Nurtec and were praised and rewarded to do so. For example, regional business director Raymond praised and rewarded a New Jersey sales representative Lisa Swayze Wood for using a food truck with the Nurtec banner. The Nurtec banners provide no product safety, warning, or restriction disclaimers. Further, the food trucks provide meals that are paid for my Biohaven without having any educational value or fair balance of educational portion of the "program" regarding the product or disease state because the

prescribers/medical staff quickly get their food and return to the office or send someone out to get the food for them. Thus, the food trucks are provided as nothing more than an inducement to win the loyalty of potential Nurtec prescribers. Nationwide, Nurtec sales representatives have been used these food trucks regularly since the Nurtec launch in March 2020.

85.     By way of example, Raymond, and Wiles allowed a food truck at the Miles for Migraine walk in Buffalo, NY on June 27, 2020. In what could be called a "lunch no learn," Biohaven paid to feed the walk participants to curry favor with providers—particularly the Dent. There was absolutely "no education component" and patients, families, etc. received the free food. This event was against the NY state guidelines during Covid-19 for events and the number of people allowed at events. Wiles blatantly disregarded the NYS Covid -19 regulations as well as Pharma regulations regarding fair market value and kickbacks in order to pander/fawn over the Dent.  Further, Wiles encouraged sales representatives to attend the walk to support the Dent wearing Nurtec t-shirts and offered to pay for hotel stays in order to have the largest pharma representation at the walk and gain allegiance from Dent Neurologic.

86.     Biohaven also directs its sales representatives to hire and pay for ice cream trucks to follow them for a full day as they drive to hospitals, doctors' offices, clinics, and headache centers to make sales calls with targeted prescribers on their call lists. Biohaven district managers provide the sales representatives with Nurtec banners to hang on the ice cream truck in order to associate the benefit of the free ice cream treats provided by Biohaven to the doctors, staff, and inevitably patients with Nurtec and establish brand loyalty. The Nurtec banners provide no product safety, warning, or restriction disclaimers. Further, the ice cream trucks provide treats paid for by Biohaven without having any educational value or fair balance of educational portion of the

"program" regarding the product or disease state to prescribers/medical staff and intended to serve as an inducement to win the loyalty of potential Nurtec prescribers.

87.    In Buffalo, for example, the sales team paid for an ice cream truck at the Dent and provided ice cream for 70 to 90 people from their building on June 3, 2020. Not all providers/staff were from the Dent because other businesses rent space in the building.   However, Biohaven provided everyone with ice cream as well because there was no way to differentiate between which patrons were affiliated with The Dent.   From the event:



88.    Biohaven provided another truck for a provider's staff in Syracuse on August 24, 2020:



89.    This practice is not limited to New York.  For example, the Philadelphia Nurtec sales representative had this ice cream truck with Nurtec banner, follow her from provider office to provider office throughout June and July 2020.  Raymond shared these photos with the whole northeast Nurtec sales force to encourage other sales representatives to do the same.  Pictures from the Philadelphia events:

 

90.     These impermissible actions furthered Biohaven's scheme to defraud the government.

### C.     Electronic Health Record Software Cost Assistance as Kickbacks

91.     Biohaven also provides financial assistance to providers in the form of EHR cost assistance via a collaboration with Two Labs Pharma Services, to induce those providers to prescribe Nurtec.  EHRs are electronic versions of a patients' medical histories, maintained by providers, that include key clinical data regarding individual patients' care, including demographics, progress notes, problems, medications, vital signs, past medical history, immunizations, laboratory data and radiology reports  The EHR automates access to information and can support other care-related activities directly or indirectly through various interfaces.

92.     While HHS-OIG acknowledges the importance of EHR, it specifically cautions against companies like Biohaven assisting providers with their EHR costs, stating "[t]he OIG believes that the efficient exchange of health information between health care providers, practitioners, and suppliers is a laudable goal. However, when the exchange takes place in the

41

context of patient referrals, we must evaluate whether the means used to achieve that goal implicate the anti-kickback statute." *See* OIG Advisory Opinion No. 14-03 (April 1, 2014) at 9.  To be sure: arrangements under which a company pays EHR-related vendor fees on a provider's behalf violate the Anti-Kickback Statute where, as here, providers "are relieved of a financial obligation . . ." and payment "could influence a Referring Physician's decision-making . . ." *Id.* at 11.

### D.    Copay Cards as Kickbacks

93.    Pharmaceutical manufacturers regularly offer copayment coupons to reduce or eliminate the cost of patients' out-of-pocket copayments for specific brand-name drugs.  Because these discount programs serve to induce the purchase of those drugs, companies extending them to government program beneficiaries violate the Anti-Kickback Statute. *See, e.g.,* HHS-OIG Study: Manufacturer Safeguards May Not Prevent Copayment Coupon Use for Part D Drugs, OEI-05-12-00540 (Sept. 2014)).

94.    Notwithstanding this explicit prohibition, Biohaven intentionally illegally markets Nurtec to prescribers with high Medicare and Medicaid patient populations. Biohaven provides the sales representatives with a "Cost and Coverage Tool" ("CCT") described by senior leadership as an expensive resource that every sales representative with every provider must use. The CCT generates customized insurance plan coverage promotional pieces for each prescribers practice according to their specific patient population. The CCT generates promotional pieces that the sales representatives are instructed to give to the providers for their patients stating that Medicare and Medicaid plans are covering Nurtec, and attached to it is a co-pay card coupon that allows insured patients to obtain Nurtec with a $0 co-pay.

95.    By providing prescribers and office billing managers with patient materials explaining Nurtec's Medicare and Medicaid coverage with co-pay coupon cards attached, they are

fraudulently leading patients to believe that that they can use the co-pay coupon to reduce their Medicare or Medicaid co-pay to $0 when they fill their Nurtec prescription at the pharmacy.

96.     When this was brought to the attention of Raymond in early July 2020, she agreed that this needed to be corrected. However, in spite of several program upgrades and rollouts to date it has not been corrected, and the sales representatives continue to leave the CCT marketing pieces with prescribers.

97.     Further, when prescribers report back to the sales representatives that their Medicare and Medicaid patients were successfully able to use the copay coupon to get Nurtec, the district managers considered this a "success story" and shared it with the rest of the sales reps in their district, who then informed other prescribers. For example, in early April 2020, Gary Helak, the Buffalo, NY North sales representative, reported to Bob Wiles on a team call that one of his prescribers from the Dent had submitted a copay coupon with a Medicare prescription for Nurtec and it was accepted. The fact that the company is aware of the illegal and misleading promotional aide and the resulting use of the co-pay coupon with Medicare and Medicaid and failed to correct it is intentional because they know that once patients have an opportunity to try Nurtec at the expense of their government plan and it works, they will want to continue using it, instead of trying a cheaper medication that may work just as well.

### E.     Misinformation Dissemination

98.     Statements that drug manufacturer representatives make to providers must not be false or misleading; companies whose representatives fail to comply with the requirements to communicate accurate information render the drug misbranded under the law. As the DOJ announced in conjunction with its $56.5M settlement with Shire Specialty Pharmaceuticals, "Patients and health care providers must receive accurate information about available prescription

drugs so that they can make safe and informed treatment decisions . . . The Department of Justice

will be vigilant to hold accountable pharmaceutical companies that provide misleading information

regarding a drug's safety or efficacy."  *U.S. ex rel. Torres v. Shire Specialty Pharm., et al.*, No.

08-4795 (E.D. Pa.).  Moreover, the pharmaceutical industry as a whole purports to support actively

what it describes as the purpose of marketing: "to benefit patients and to enhance the practice of

medicine," and, as such, instructs that "[i] nteractions should be focused on informing health care

professionals about products, providing scientific and educational information and supporting

medical education."  *See* PhrMA Code.  Company promotional materials also must be accurate:

> Promotional materials provided to health care professionals by or on
> behalf of a company should: (a) be accurate and not misleading; (b)
> make claims about a product only when properly substantiated; (c)
> reflect the balance between risks and benefits; and (d) be consistent
> with all other Food and Drug Administration (FDA) requirements
> governing such communications.

*Id.*

99.    The Food and Drug Administration ("FDA") requires even more when

manufacturers make comparisons to competing products, mandating that comparative claims, in

addition to being truthful, relate to the approved uses of the products compared,  and that the

products also must be approved for the same indication and at the dosage regimens used in the

comparison, provide an appropriate basis for the comparison and be from the same part of the

dosage range (*e.g.*, a comparison of the maximum- or minimum- doses). *Id.*

100.    Again, Biohaven acts under its own rules. Biohaven's senior management and

training department provided the Nurtec sales force with a marketing competitive sales aid to use

on their sales calls that compares Nurtec directly to the competitive drug options. This is false and

misleading because the FDA approved Nurtec in February 2020 based on evidence from one

clinical trial (Trial 1/NCT03461757) of 1351 patients with migraine headaches and compared its

efficacy and safety with placebo. To be sure: no head-to-head studies were conducted to establish that Nurtec is safer or more effective than any other treatment option.  On a district team sales call DM Bob Wiles specifically stated his appreciation that Biohaven invested so much time and money into this competitive interactive tool that the sales representatives should use it with the pharma "wink and nod" disclaimer to not to use it in the field. Further, Biohaven continues to disseminate false and misleading messaging regarding its efficacy by stating on social media, on sales calls with providers, in its paid speaker presentations, and in marketing materials that Nurtec works in "minutes." As discussed above, this is false and misleading because the FDA approved drug label for Nurtec states specifically "The primary efficacy analyses were conducted in patients who treated a migraine with moderate to severe pain. NURTEC ODT 75 mg demonstrated an effect on pain freedom and most bothersome symptom (MBS) freedom at two hours after dosing, compared to placebo…the percentage of patients achieving headache pain freedom and MBS freedom two hours after a single dose was statistically significantly greater in patients who received NURTEC ODT compared to those who received placebo." https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/212728s000lbl.pdf at 11; and "…statistically significant effects of NURTEC ODT compared to placebo were demonstrated for the additional efficacy endpoints of pain relief at 2 hours, sustained pain freedom 2-48 hours, use of rescue medication within 24 hours, and the percentage of patients reporting normal function at two hours after dosing (Table 2). Pain relief was defined as a reduction in migraine pain from moderate or severe severity to mild or none. The measurement of the percentage of patients reporting normal function at two hours after dosing was derived from a single item questionnaire, asking patients to select one response on a 4-point scale; normal function, mild impairment, severe impairment, or required bedrest." *Id.* at 13.

## COUNT I
### (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

101.    Relator repeats each allegation in each of the preceding paragraphs of this Complaint with the same force and effect as if set forth herein.

102.    As described above, Defendant has submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TRICARE by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government).

103.    By virtue of the acts described above, Defendant has violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

104.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendant knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2), (7) prior to amendment, by engaging in the above-described conduct.

105.    By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relator prays that the Court enter judgment against Defendant as follows:

(a)    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, provides;

(b)      that civil penalties of $21,730 be imposed for each and every false claim that Defendant caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendant made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)      that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d)      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

(e)      that this Court order such other and further relief as it deems proper.

## <u>COUNT II</u>
### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

106.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

107.    This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

108.    Cal. Gov't Code § 12651(a) provides liability for any person who:

(1)      Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)      Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3)      Conspires to commit a violation of this subdivision.

(4)      Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

(5)     Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6)     Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8)     Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

109.    Defendant violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded health care programs.

110.    The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendant's conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

111.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California in connection with Defendant's conduct.  Compliance with applicable California statutes was also a condition of payment of claims submitted to the State of California.

112.    Had the State of California known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

113.    As a result of Defendant's violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

114.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

115.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of California;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>**COUNT III**</u>
**(California Insurance Fraud Prevention Act, Cal Ins. Code §§ 1871.1 *et seq.*)**

116.    All of the preceding allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

117.    This is a claim for treble damages and penalties under the CIFPA.

118.    Pursuant to Cal. Ins. Code § 1871.4(a), it is unlawful to:

(1)    Make or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code.

(2)    Present or cause to be presented a knowingly false or fraudulent written or oral material statement in support of, or in opposition to, a claim for compensation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code.

(3)    Knowingly assist, abet, conspire with, or solicit a person in an unlawful act under this section.

(4)    Make or cause to be made a knowingly false or fraudulent statement with regard to entitlement to benefits with the intent to discourage an injured worker from claiming benefits or pursuing a claim. . . .

119.    By virtue of the acts described above, Defendant knowingly utilized a scheme by which it presented, or caused to be presented, false or fraudulent claims to private insurers in California, or for patients in California that those insurers covered (i.e., patients who hold private insurance contracts and against whom Defendant could file claims for payment or approval) in violation of each patient's private health insurance contract.

120.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements and omitted material facts to induce the private

insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

121.    By virtue of the acts described above, Defendant conspired to violate the CIFPA and each patient's private health insurance contract.

122.    The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

123.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligation to return overpayments to these private insurance companies.

124.    By reason of Defendant's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

125.    Each claim for reimbursement that was a result of Defendant's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

126.    The State of California is entitled to the maximum penalty of $10,000 per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented or caused to be made, used, or presented by Defendant.

## <u>COUNT IV</u>
**(Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq*.)**

127.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

128.    This is a *qui tam* action brought by Relator on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

129.    Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-305, provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; or

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

130.    Defendant violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and

systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

131.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

132.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendant's conduct. Compliance with applicable Colorado statutes was also a condition of payment of claims submitted to the State of Colorado.

133.    Had the State of Colorado known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

134.    As a result of Defendant's violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

135.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of himself and the State of Colorado.

136.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Colorado, except that this upper limit on liability is subject to an automatic adjustment in accordance with the federal Civil Penalties Inflation Adjustment Act of 1990 ("CPIAA");

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT V
### (Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*)

137.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

138.    This is a *qui tam* action brought by Relator on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

139.    Conn. Gen. Stat. § 4-275 imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

(2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

(3) Conspire to commit a violation of this section;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a state-administered health or human services program, knowingly deliver, or cause to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a state-administered health or human services program and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a state-administered health or human services program, who lawfully may not sell or pledge the property;

(7) Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program; or

(8) Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services

program.

140.     Defendant violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

141.     The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

142.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendant's conduct. Compliance with applicable Connecticut statutes was also a condition of payment of claims submitted to the State of Connecticut.

143.     Had the State of Connecticut known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

144.     As a result of Defendant's violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

145.     Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Connecticut False Claims Act on behalf of himself and the State of Connecticut.

146.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF CONNECTICUT:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Connecticut, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 4-275 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT VI</u>
**(Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*)**

147.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

148.    This is a *qui tam* action brought by Relator on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*

149.    6 Del. C. § 1201(a) in pertinent part provides for liability for any person who:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (3) Conspires to commit a violation of paragraph (a)(1), (2), . . . or (7) of this section; or

> * * *

> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

150.    Defendant furthermore violated the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

151.    The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

152.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and  also an express condition of payment of claims submitted to the State of Delaware in connection with Defendant's conduct. Compliance with

applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the State of Delaware.

153.    Had the State of Delaware known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

154.    As a result of Defendant's violations of the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

155.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, on behalf of himself and the State of Delaware.

156.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

(1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VII
### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

157.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

158.    This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq*.

159.    Fla. Stat. § 68.082(2) provides liability for any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit a violation of this subsection.

160.    Defendant further violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

161.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

162.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendant's conduct. Compliance with applicable Florida statutes was also a condition of payment of claims submitted to the State of Florida.

163.    Had the State of Florida known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

164.    As a result of Defendant's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

165.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

166.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF FLORIDA:

> (1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

> (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Florida;

> (3) Pre- and post-judgment interest; and

> (4) All costs incurred in bringing this action.

To Relator:

> (1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

> (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

> (3) An award of reasonable attorneys' fees and costs; and

> (4) Such further relief as this Court deems equitable and just.

## <u>COUNT VIII</u>
### (Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq*.)

167.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

168.    This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*

169.    The Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168-1, imposes liability on any person who:

> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)  Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;

(4)  Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivers, or causes to be delivered, less than all of such property or money;

(5)  Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6)  Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7)  Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

170.    Defendant violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

171.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

172.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in

connection with Defendant's conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to the State of Georgia.

173.    Had the State of Georgia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

174.    As a result of Defendant's violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

175.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of himself and the State of Georgia.

176.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF GEORGIA:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>**COUNT IX**</u>
**(Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)**

177.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

178.    This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

179.    Section 661-21(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; or

* * *

(8) Conspires to commit any of the conduct described in this subsection.

180.    Defendant violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

181.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

182.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendant's conduct. Compliance with applicable Hawaii statutes was also a condition of payment of claims submitted to the State of Hawaii.

183.    Had the State of Hawaii known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

184.    As a result of Defendant's violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

185.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-21 on behalf of himself and the State of Hawaii.

186.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Hawaii;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT X
**(Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)**

187.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

188.    This is a *qui tam* action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

189.    740 ILCS 175/3(a)(1) provides liability for any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(C)    conspires to commit a violation of subparagraph (A), (B) . . . .

190.    Defendant violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

191.    The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

192.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendant's conduct. Compliance with applicable Illinois statutes was also a condition of payment of claims submitted to the State of Illinois.

193.    Had the State of Illinois known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

194.    As a result of Defendant's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

195.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

196.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF ILLINOIS:

(1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Illinois;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI
**(Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat.  §§ 92/1 *et seq.*)**

197.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

198.    This is a claim for treble damages and penalties under the IICFPA.

199.    Pursuant to 740 Ill. Comp. Stat. § 92/5(a):

> A person who violates any provision of this Act, . . . or Section 17-10.5 of the Criminal Code . . . shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

200.    720 Ill. Comp. Stat. § 5/17-10.5 provides, in pertinent part:

> (a)  Insurance fraud.
>
> > (1)  A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.
> >
> > (2)  A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

* * *

> (c)  Conspiracy to commit insurance fraud. . . .

201.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois that those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

202.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

203.    Defendant knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

204.    By virtue of the acts described above, Defendant knowingly utilized a scheme by which it presented, or caused to be presented, false or fraudulent claims to private insurers in Illinois, or for patients in Illinois that those insurers covered (i.e., patients who hold private insurance contracts and against whom Defendant could file claims for payment or approval) in violation of each patient's private health insurance contract.

205.    By virtue of the acts described above, Defendant conspired to violate the IICFPA and each patient's private health insurance contract.

206.    The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

207.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments to these private insurance companies.

208.    By reason of Defendant's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

209.    Each claim for reimbursement that was a result of Defendant's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

210.    State of Illinois is entitled to the maximum penalty of $10,000 per violation, plus an assessment of three times the amount of each false or fraudulent claim for compensation made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XII
**(Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)**

211.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

212.    This is a *qui tam* action brought by Relator on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5-2, which imposes liability on:

(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6) . . . .

213.    Defendant violated the Indiana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

214.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

215.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Indiana in connection with Defendant's conduct. Compliance with applicable Indiana statutes was also a condition of payment of claims submitted to the State of Indiana.

216.    Had the State of Indiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

217.    As a result of Defendant's violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

218.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ind. Code § 5-11-5.5 *et seq.* on behalf of himself and the State of Indiana.

219.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF INDIANA:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Indiana, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Ind. Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XIII
**(Iowa False Claims Law, I.C.A. § 685.1 *et seq.*)**

220.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

221.    This is a *qui tam* action brought by Relator on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq*.

222.    Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.
>
> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
>
> (c) Conspires to commit a violation of paragraph "a", "b" . . . .

223.

1.    Defendant violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq*. and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

2.    The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

3.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendant's conduct. Compliance with applicable Iowa statutes was also a condition of payment of claims submitted to the State of Iowa.

4.    Had the State of Iowa known that Defendant was violating the federal and state

laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

5.      As a result of Defendant's violations of the Iowa False Claims Law, I.C.A. § 685.1 *et seq*., the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

6.      Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq*., on behalf of himself and the State of Iowa.

7.      This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF IOWA:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Iowa, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq*. and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XIV</u>
**(Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*.)**

224.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

225.     This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq*.

226.     La. Rev. Stat. Ann. § 46:438.3 provides:

(A) No person shall knowingly present or cause to be presented a false or fraudulent claim.

(B) No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

(C) No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

(D) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

227.     Defendant further violated La. Rev. Stat. Ann. § 46:438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and

systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

228.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

229.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and  also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendant's conduct.  Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

230.    Had the State of Louisiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

231.    As a result of Defendant's violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

232.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 46:439.1(A) on behalf of himself and the State of Louisiana.

233.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

(1) Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Louisiana, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XV
**(Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*)**

234.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

235.    This is a *qui tam* action brought by Relator on behalf of the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*

236.    Section 2-602 of Maryland's False Claims Act imposes liability as follows:

(a) A person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

(4) Have possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly deliver or cause to be delivered to the State less than all of that money or other property;

(5) (i)  Be authorized to make or deliver a receipt or other document certifying receipt of money or other property used or to be used by the State under a State health plan or a State health program; and (ii) Intending to defraud the State or the Department, make or deliver a receipt or document knowing that the information contained in the receipt or document is not true;

(6) Knowingly buy or receive as a pledge of an obligation or debt publicly owned property from an officer, employee, or agent of a State health plan or a State health program who lawfully may not sell or pledge the property;

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

237.    Defendant violated the Maryland False Claims Act, and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

238.    The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

239.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Maryland in connection with Defendant's conduct.  Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Maryland.

240.    Had the State of Maryland known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

241.    As a result of Defendant's violations of the Maryland False Claims Act, the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

242.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Claims Act on behalf of himself and the State of Maryland.

243.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF MARYLAND:

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendant's conduct;

(2) A civil penalty of not more than $10,000 for each false claim which Defendant caused to be presented to the State of Maryland;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Maryland False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVI
### (Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)

244.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

245.     This is a *qui tam* action brought by Relator on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.603, which provides in pertinent part:

> (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

> (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit. . . .

246.     Defendant violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

247.     The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

248.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendant's conduct.  Compliance with applicable Michigan statutes was also a condition of payment of claims submitted to the State of Michigan.

249.     Had the State of Michigan known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

250.    As a result of Defendant's violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

251.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Medicaid False Claims Act on behalf of himself and the State of Michigan.

252.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Michigan;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVII
### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

253.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

254.    This is a *qui tam* action brought by Relator on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*

255.    Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)   knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)   knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

(4)   has possession, custody, or control of property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered less than all of that money or property;

(5)   is authorized to make or deliver a document certifying receipt for money or property used, or to be used, by the state or a political subdivision and, intending to defraud the state or a political subdivision, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6)   knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7)   knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

256.    Defendant violated the Minnesota False Claims Act and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

257.    The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

258.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendant's conduct. Compliance with applicable Minnesota statutes was also a condition of payment of claims submitted to the State of Minnesota.

259.    Had the State of Minnesota known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

260.    As a result of Defendant's violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

261.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Minnesota False Claims Act on behalf of himself and the State of Minnesota.

262.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF MINNESOTA:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Minnesota;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVIII
### (Montana False Claims Act, MCA § 17-8-401 *et seq.*)

263.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

264.    This is a *qui tam* action brought by Relator on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

265.    Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

    (a)  knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

    (b)  knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

    (c)  conspires to commit a violation of this subsection (1);

    (d)  has possession, custody, or control of public property or money used or to be used by the governmental entity and knowingly delivers or causes to be delivered less than all of the property or money;

    (e)  is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without completely knowing that the information on the receipt is true;

    (f)  knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;

    (g)  knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity; or

    (h)  as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

266.    Defendant violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in

connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

267.    The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

268.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Montana in connection with Defendant's conduct. Compliance with applicable Montana statutes was also a condition of payment of claims submitted to the State of Montana.

269.    Had the State of Montana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

270.    As a result of Defendant's violations of the Montana False Claims Act, the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

271.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Montana False Claims Act on behalf of himself and the State of Montana.

272.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages

to the following parties and against Defendant:

To the STATE OF MONTANA:

(1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XIX
**(Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*)**

273. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

274. This is a *qui tam* action brought by Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*

275. N.R.S. § 357.040(1) provides liability for any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

(c) Has possession, custody or control of public property or money used or to be used by the State or a political subdivision and knowingly delivers or causes to be delivered to the State or a political subdivision less money or property than the amount of which the person has possession, custody or control.

(d) Is authorized to prepare or deliver a document that certifies receipt of money or property used or to be used by the State or a political subdivision and knowingly prepares or delivers such a document without knowing that the information on the document is true.

(e) Knowingly buys, or receives as a pledge or security for an obligation or debt, public property from a person who is not authorized to sell or pledge the property.

(f) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

(g) Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

(h) Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the State or political subdivision within a reasonable time.

(i) Conspires to commit any of the acts set forth in this subsection.

276. Defendant violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

277. The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

278. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in

connection with Defendant's conduct. Compliance with applicable Nevada statutes was also a condition of payment of claims submitted to the State of Nevada.

279.    Had the State of Nevada known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

280.    As a result of Defendant's violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

281.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

282.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Nevada, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.R.S. § 357.040 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XX
### (New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)

283.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

284.    This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

285.    N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the

entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

286.    Defendant violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

287.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

288.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendant's conduct. Compliance with applicable New Jersey statutes was also a condition of payment of claims submitted to the State of New Jersey.

289.    Had the State of New Jersey known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

290.    As a result of Defendant's violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

291.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New Jersey False Claims Act on behalf of himself and the State of New Jersey.

292.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEW JERSEY:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act for each false claim which Defendant caused to be presented to the State of New Jersey;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXI**

**(New Jersey Medical Assistance & Health Services, Act, N.J.S.A. 30:4D-1 *et seq.*)**

293.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

294.    The New Jersey Medical Assistance and Health Services Act ("NJMAHS"), N.J.S.A. 30:4D-1 *et seq.*, is aimed at providing medical assistance to residents with limited resources, but also provides FCA-like protections in the event of a violation.

295.    Pursuant to N.J.S.A. 30:4D-17(b), it is illegal for any provider, or any person, firm, partnership, or entity to:

> (1)  Knowingly and willfully make or cause to be made any false statement or representation of a material fact in any cost study, claim form, or any document necessary to apply for or receive any benefit or payment under P.L.1968, c.413; or
>
> (2)  At any time knowingly and willfully make or cause to be made any false statement, written or oral, of a material fact for use in determining rights to such benefit or payment under P.L.1968, c.413; or
>
> (3)  Conceal or fail to disclose the occurrence of an event which
>
>> (i)  affects a person's initial or continued right to any such benefit or payment, or
>>
>> (ii)  affects the initial or continued right to any such benefit or payment of any provider or any person, firm, partnership, corporation, or other entity in whose behalf a person has applied for or is receiving such benefit or payment with an intent to fraudulently secure benefits or payments not authorized under P.L.1968, c.413 or in a greater amount than that which is authorized under P.L.1968, c.413; or
>
> (4)  Knowingly and willfully convert benefits or payments or any part thereof received for the use and benefit of any provider or any person, firm, partnership, corporation, or other entity to a use other than the use and benefit of such provider or such person, firm, partnership, corporation, or entity . . . .

296.    In addition to any other penalties provided by law, violators of the NJMAHS shall be liable for civil penalties of: (1) payment of interest on the amount of the excess benefits or payments at the maximum legal rate in effect on the date the payment was made; (2) payment of an amount not to exceed three-fold the amount of such excess benefits or payments; and (3) payment in the sum of not less than and not more than the civil penalty allowed under the federal False Claims Act, as it may be adjusted for inflation, for each claim for assistance, benefits or payment.  N.J.S.A. 30:4D-17(e).

297.    In this matter, Defendant submitted bills to the New Jersey State Government for payment and retained improperly obtained payments arising from their illegal off-label promotion and sale of Fanapt and Hetlioz.  All such false claims were knowingly submitted to get false or fraudulent claims paid or approved by the New Jersey State Government.

298.    As a result of Defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the State of New Jersey is entitled to at least $10,781 and not more than $21,563 for each false or fraudulent claim, plus three times the amount of damages which the State sustains arising from Defendant's unlawful conduct as described herein.

## COUNT XXII
### (New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)

299.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

300.    This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, which provides in pertinent part:

A person shall not:

    (1)  knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee, or other recipient of state funds or political subdivision funds a false or fraudulent claim for payment or approval;

    (2)  knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim; or

    (3)  conspire to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim . . . .

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

301.    Defendant violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

302.    The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendant' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

303.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Mexico in connection with Defendant's conduct. Compliance with applicable New Mexico statutes was also a condition of payment of claims submitted to the State of New Mexico.

304.    Had the State of New Mexico known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

305.    As a result of Defendant's violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

306.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of himself and the State of New Mexico.

307.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEW MEXICO:

(1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Mexico;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXIII
### (New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*)

308.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

309.    This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State Fin. Law § 189, which imposes liability on any person who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) conspires to commit a violation of paragraph (a), (b) . . . .

310.    Defendant violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

311.    The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

312.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York

in connection with Defendant's conduct. Compliance with applicable New York statutes was also a condition of payment of claims submitted to the State of New York.

313.    Had the State of New York known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

314.    As a result of Defendant's violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

315.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New York State False Claims Act, on behalf of himself and the State of New York.

316.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEW YORK:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New York;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXIV</u>
**(North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)**

317.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

318.    This is a *qui tam* action brought by Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq*.

319.    North Carolina's False Claims Act, N.C.G.S.A. § 1-607(a), provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the

State, makes or delivers the receipt without completely knowing that the information on the receipt is true.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

320.    Defendant violated the North Carolina False Claims Act, and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

321.    The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

322.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendant's conduct.  Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of North Carolina.

323.    Had the State of North Carolina known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs

or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

324.    As a result of Defendant's violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

325.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act on behalf of himself and the State of North Carolina.

326.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1) Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of North Carolina;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXV
**(Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*)**

327.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

328.    This is a *qui tam* action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*

329.    Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of the Oklahoma Medicaid False Claims Act;

(4) Has possession, custody, or control of property or money used, or to be used, by the state knowingly delivers, or causes to be delivered, less than all of such money or property;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the state who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids

or decreases an obligation to pay or transmit money or property to the state.

330.    Defendant violated the Oklahoma Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

331.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

332.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendant's conduct.  Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

333.    Had the State of Oklahoma known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

334.    As a result of Defendant's violations of the Oklahoma Medicaid False Claims Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

335.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of himself and the State of Oklahoma. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF OKLAHOMA:

(1) Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Oklahoma;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXVI
### (Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)

336.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

337.    This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

338.    Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for liability for any person who:

> (1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7);

> (4) Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less property than all of that money or property;

> (5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

> (6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the guard, who lawfully may not sell or pledge the property; or

> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

339.    Defendant violated the Rhode Island False Claims Act and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

340.    The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

341.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendant's conduct.  Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

342.    Had the State of Rhode Island known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

343.    As a result of Defendant's violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

344.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of himself and the State of Rhode Island.

345.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages

to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

(1) Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXVII
### (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

346.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

347.    This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

348.    Section 71-5-182(a)(1) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program;

(3) Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)((B), or (a)(1)((D); or

(4) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program.

349.    Defendant violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

350.    The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

351.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendant's conduct.  Compliance with applicable Tennessee statutes was also a condition of payment of claims submitted to the State of Tennessee.

352.    Had the State of Tennessee known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

353.    As a result of Defendant's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

354.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

355.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendant caused to be presented to the State of Tennessee, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXVIII</u>
**(Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)**

356.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

357.    This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

358.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who:

(1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3)    knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

   a.  the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as . . . .

   b.  information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5)    except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6)  knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

a.  is not licensed to provide the product or render the service, if a license is required; or

b.  is not licensed in the manner claimed;

(7)  knowingly makes or causes to be made a claim under the Medicaid program for:

a.  a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

b.  a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

c.  a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(8)  makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9)  conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

(10)  is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:

a.  fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract;

b.  fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or

c.  engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(11)  knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12)    knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)    knowingly engages in conduct that constitutes a violation under Section 32.039(b).

359.    Defendant violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

360.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

361.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendant's conduct. Compliance with applicable Texas statutes was also a condition of payment of claims submitted to the State of Texas.

362.    Had the State of Texas known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

363.    As a result of Defendant's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

364.    Defendant did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

365.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

366.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $11,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendant caused to be presented to the state of Texas, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

    (1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XXIX
### (Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)

367. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

368. This is a *qui tam* action brought by Relator on behalf of the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

369. Vt. Stat. Ann. tit. 32, § 631(a) in pertinent part provides for liability for any person who:

> (1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

> (2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

> (3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;

> (4) knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn;

* * *

(9) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;

(10) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; or

* * *

(12) conspire to commit a violation of this subsection.

370.    Defendant violated the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Vermont by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

371.    The State of Vermont, by and through the Vermont Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

372.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of Vermont in connection with Defendant's conduct. Compliance with applicable Vermont statutes and regulations was also an express condition of payment of claims submitted to the State of Vermont.

373.    Had the State of Vermont known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

374.    As a result of Defendant's violations of the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

375.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, on behalf of himself and the State of Vermont.

376.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF VERMONT:

(1) Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Vermont, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in investigating and bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXX
**(Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*.)**

377.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

378.    This is a *qui tam* action brought by Relator on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*.

379.    RCWA 74.66.020(1) in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit one or more of the violations in this subsection

380.    Defendant violated the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*., and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

381.    The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

382.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims

submitted to the State of Washington in connection with Defendant's conduct. Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

383.    Had the State of Washington known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

384.    As a result of Defendant's violations of the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

385.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*. on behalf of himself and the State of Washington.

386.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

(1) Three times the amount of actual damages which the State of Washington has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Washington;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*. and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXXI</u>
**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*)**

387.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

388.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*

389.    Mass. Gen. Laws Ann. Ch. 12 § 5B(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or

(3) conspires to commit a violation of this subsection; or

* * *

(10) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment, and fails to disclose the false claim or receipt

of overpayment to the commonwealth or a political subdivision by the later of:

(i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or

(ii) the date any corresponding cost report is due . . . .

390.   Defendant violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

391.   The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

392.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant's conduct. Compliance with applicable Massachusetts statutes was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

393.   Had the Commonwealth of Massachusetts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

394.    As a result of Defendant's violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

395.    Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

396.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the Commonwealth OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Massachusetts, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXII
### (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)

397.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

398.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A), which provides liability for any person who:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (3) Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7; or

> \* \* \*

> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

399.    Defendant furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3(A), and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

400.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

401.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct.  Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

402.    Had the Commonwealth of Virginia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

403.    As a result of Defendant's violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

404.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of himself and the Commonwealth of Virginia.

405.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXIII
### (District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*)

406.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

407.    This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-381.02 *et seq.*

408.    D.C. Code § 2-381.02(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Has possession, custody, or control of property or money used, or to be used, by the District and knowingly delivers, or causes to be delivered, less than all of that money or property;

(4)  Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the District and, intending to defraud the District, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(5)  Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the District who lawfully may not sell or pledge property;

(6)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

(7)  Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

(8)  Is a beneficiary of an inadvertent submission of a false or fraudulent claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false or fraudulent claim to the District; or

(9)  Is the beneficiary of an inadvertent payment or overpayment by the District of monies not due and knowingly fails to repay the inadvertent payment or overpayment to the District.

409.  Defendant violated D.C. Code § 2-381.02 and knowingly caused false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

410.  The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendant's illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

411.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia

in connection with Defendant's conduct. Compliance with applicable District of Columbia statutes was also a condition of payment of claims submitted to the District of Columbia.

412. Had the District of Columbia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

413. As a result of Defendant's violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

414. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

415. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the District of Columbia, except that this upper limit on liability is subject to an automatic adjustment in accordance with the CPIAA;

(3) Pre- and post-judgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

      (1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

      (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

      (3) An award of reasonable attorneys' fees and costs; and

      (4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

416.    Relator demands a jury trial as to all issues.

DATED: August 5, 2021            Respectfully submitted,

By: _____

**THE WEISER LAW FIRM, P.C.**
CHRISTOPHER L. NELSON
JOHN J. GROSS
ROSS M. WOLFE
cnelson@weiserlawfirm.com
jgross@weiserlawfirm.com
rwolfe@weiserlawfirm.com
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
TEL: (610) 225- 0210

*Attorneys for Plaintiff-Relator*

JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a)  PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| United States ex rel Patricia Frattasio | Biohaven Pharmaceuticals, Inc.; Biohaven Pharmaceuticals Holding Company, Ltd. |

| **(b)**  County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant   New Haven County (CT) |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| The Weiser Law Firm, P.C. (see attached) | |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from Another District *(specify)*

☐ 6  Multidistrict Litigation - Transfer

☐ 8  Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
US False Claims Act 31 U.S.C. § 3729 et seq.

Brief description of cause:
False claims for payment recieved by Defendant

| VII.  REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII.  RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| | s/ John J. Gross |

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.